Good morning. May it please the Court, my name is Linda Larson for ASARCO, LLC. I'd like to reserve two minutes of my time for rebuttal. Your Honors, in this case, ASARCO seeks contribution under Section 113F3B of CERCLA for reimbursement of the approximately $33 million it voluntarily paid to the State of California in a 2008 settlement. I thought that the DTSC, if I'm getting the initials right, is that the name of the State agency? It's the Department of Toxic Substances Control. All right. DTSC, I thought that they had required you all to basically pay for, you know, the $33 million or whatever. That's the figure that it ended up being, but they actually put in a claim for much more in the bankruptcy. But I thought that was money that you were being, your client, rather, was being required to pay as part of the cleanup. No, it was not, Your Honor, for two reasons. First, the only cleanup that had been done at the site was pursuant to a voluntary non, a voluntary agreement between private parties that was entered into in 1989. And one of the key issues in this case is there was great uncertainty throughout the subsequent 30 years about what, if anything, the State of California and the Department of Toxic Substances Control would require when it decided on a permanent remedy. And as of 2008, that permanent remedy, in fact, had not been selected by the Department. So what happened in the bankruptcy was that the Department submitted a proof of claim, which, of course, would be a general unsecured claim that would have to go to estimation by the bankruptcy court. So all of the evidence in the record is around the parties' estimation, attempts to estimate what the future costs of this cleanup for the permanent remedy might end up being, as opposed to the four initial interim final remedy measures that were taken pursuant to the 1989 agreement. Roberts, I'll just tell you where I'm getting thrown off track, perhaps. It's just the, it's the one, two, three, it's the fourth whereas clause in the settlement agreement entered in the bankruptcy case, and it just says, whereas the State of California Department of Toxic Substances Control is now requiring the SARCO, blah, blah, blah, blah, to conduct additional. That's where I thought, well, yeah, boy, it sounds like the State is coming in and requiring your client to do this. And so when you started out saying, well, we just voluntarily decided to throw a bunch of money at this problem, it just didn't, that didn't jive for me. Okay. Well, in the bankruptcy, I don't know where that whereas clause came from, but in the bankruptcy, it is absolutely true that a SARCO was facing exposure for 100 percent liability for future cleanup costs at the site, because under the State's enforcement authority, it could be held to be jointly and severally liable for all remaining costs at the site. But what was happening in the bankruptcy, because the site had not selected a permanent remedy, was that the parties were trying to convince the bankruptcy court about what the amount of that allowable claim should be. And so the estimates ranged from $51 million on a SARCO's part to $85 million on the State of California's part to $144 million by the Department of the or by the private parties to the Wicklund agreement. So I think the key thing for CERCLA purposes and for the statute of limitations purposes is that no permanent remedy had been selected at the time of the bankruptcy. So what's happening is the parties are settling what is their mutual risk that the bankruptcy judge will come up with a different number than they all want. But it's all under the terms of the 1989 settlement agreement or consent judgment, whatever you want to call it, right? No, it's not. I mean, that's where you got the $33 million. Wasn't that figure derived from a SARCO's share of the Phase I remediation costs under that agreement? No, it was not, Your Honor. The 1989 Wicklund agreement was an agreement where private parties agreed to take four initial measures to control the sources of contamination at the site. And certainly Part I of the Wicklund agreement specifies very clearly what those things are going to be to the point of attaching that remedial action work plan by Levine-Fricke. But they don't know at that point whether those measures are going to be enough. And whether the State is going to require more from them. So they agree on a way to minimize the fighting going forward for another category of costs. But all they agree to do is how to decide whether or not they're going to pay those costs. And if they pay those costs, mutually, unanimously decide to pay those costs, what the allocation will be. And what we know from the other courts who have circuits who have grappled with this problem, such as the First Circuit in American Psyonimid, which I always hesitate before I say, that there is a distinction between even a declaration of liability or an allocation of liability and, for contribution purposes, between the actual fixture or incurrence of specific costs for specific work. And because contribution is a derivative action, you cannot have a lime-liquid live claim for contribution until you have, in fact, overpaid. So in 1989, a Sarko ---- Roberts, let me just make sure I understand this. I had assumed that in 1989, when your client enters that agreement, that even though with respect to the future costs, you're right, that nobody could predict exactly what this is eventually all going to come up. But that you could have brought a contribution action at that point against, I can't remember the name of this other entity, Virginia Chemicals, whatever it is. I say Virginia Chemicals because I've had to deal with this exact same issue. Yeah, Virginia Chemicals. You could have brought an action against them at that point just to fix, like, look, we're on the hook for 33 percent or 42 percent, whatever it is, but you're going to be on the hook for X percent, even though we have no idea right now what the actual dollar figure is going to be. I thought in 1989 you could have brought such a contribution action. Am I wrong on that? No, I think they could have brought that kind of contribution action because at that point they had been subject to a 107 action by Brooklyn Oil. So the question is, not having brought that action, either against Virginia Chemical or against the railroad, why should they be able to bring it now merely because the extent of your actual liability has been capped in a bankruptcy proceeding? So instead of you being faced with some unlimited, oh, my God, I don't know how much money it's going to be, you now know exactly what it's going to be. So all of a sudden, all of a sudden you get to bring a contribution action that you never brought within three years after entering into the judicially approved private settlement? That doesn't seem fair to me, and I'm not sure I read the statute your way to allow you to do it. All right, Your Honor, I understand your question, but I think what we have here is Supreme Court instruction that the right of contribution under F-1, which is what ASARCO could have had in 1989, and the right of contribution under F-3, which is the claim that ASARCO is currently bringing, are separate and distinct actions. And they are separate and distinct actions because the statute unequivocally says if you settle with the United States or a State, you get an unqualified right of contribution against those who are not part of that settlement. And that is what happened in 2008. So for purposes of this case, frankly, the 1989 agreement doesn't matter because ASARCO is not seeking those costs. If it had an F-1 claim with associated with the WIPO. Kagan, so are you conceding for purposes of the argument you're now making that there is a three-year statute of limitations that runs after a judicially approved private settlement? And you're saying, but this is a different proposition. It has nothing to do with the settlement. No, I'm not conceding that. Okay. But are you arguing then, independent of that argument, this is a totally separate settlement? This is a totally separate settlement. So this is the second part of Judge Alsop's order with which you are disagreeing at this point, not the statute of limitations part, but whether or not this order is sufficiently separate from the 89 settlement that it should be considered as quite independent of whether there's a statute of limitations or not, it doesn't matter. That's the argument? The argument is that Section F-3B conveys a separate and distinct right of contribution from F-1. That is what ASARCO gained in 2008 when it settled future costs for the permanent remedy with the State of California. It could only have gained that separate contribution right in 2008 because the premise of it is that there's a settlement with the government, and it had not done so before. The second part of that is through the black-letter law that the limitations period cannot begin to run until all of the action, elements of the cause of action have accrued. So here you have to have a decision. Kagan, if I understand you then, are you saying that ASARCO may still be on the hook under the 89 settlement? No, it's not, because it's been discharged in bankruptcy. Well, then I'm back to why are you saying this is separate, because it seems to me you've just discharged any possible obligation you had under the 89 settlement. You're now seeking contribution for that amount that you've been assessed that discharges you under that settlement. So I'm right back to the settlement. Well, actually, Your Honor, there's the factual premise of your question is incorrect. In the bankruptcy, the private parties to the Wickland agreement accepted payment of their past costs, roughly between $200,000 and $300,000 each, as settlement of their claim for past costs. ASARCO objected to and, in fact, did not pay for any future costs under the Wickland agreement, because those costs are contingent, unliquidated costs that are not subject to estimation by the bankruptcy court. So the way it discharged itself from the Wickland agreement was to pay the parties' past costs. It's a separate issue of how it discharges itself from the risk of being imposed 100 percent responsibility for the future cleanup of the site by the State of California. And that is what it liquidated in the bankruptcy. Does that answer your question? Yes, although I had not understood the argument in quite the form you're now making it from reading your brief. I apologize for that. Well, I'm not sure it's your fault. It might be my fault. Could you address the statute limitation, the three-year statute, the three-year limitation period? I'm having trouble reading the statute to say that if it's a private settlement that is judicially approved, that the three-year statute limitation doesn't apply. I mean, there's nothing in that statute of limitations that says it has to be a settlement agreement with either the State or the United States. It just says settlement agreement. So how can I read into that a requirement that it read into it a qualification that says this three-year statute only runs if it's an agreement with, I guess, the United States or a State? Well, first of all, I would say you're in a lot of good company, that many courts and litigants have a hard time figuring out Section 113F of CERCLA. Well, I don't have a hard time figuring it out. I think I have figured it out. Oh, okay. But you're trying to upset what seems to me the clear meaning of the text. All right. Well, the clear meaning of the text, which is basically the plain language interpret or canon of statutory interpretation, in this situation for this particular statute, is has been sort of superseded by the Supreme Court's specific instruction in Cooper Industries to read Section 113 as a whole. When you read Section 113 as a whole, you have to also look at the the you have to look at the the statute the causes of action in F and compare them to the statute of limitations in G. And though the Supreme Court has instructed those two things correspond. Yeah, but in Cooper, the only thing they do is say read a statute as a whole. We always read a statute as a whole. And it says nothing in Cooper that addresses the particular question in front of us. What addresses the particular question in front of us is the particular cause of action that is being brought by ASARCO, which is an F3B claim, and it's clear that FG3B or, excuse me, G3B corresponds in general to settlements with the United States. There's a couple of different statutory settlements that can happen, and then there is this judicially approved settlement thing. That has to mean something different from the judgment limitation that you see in A. Why does it have to? Because otherwise, judicially approved settlements are just subsumed by judgments. Why are you calling it out? Well, let me ask you a separate question that's related, and you may be able to help me because I'm not an expert on CERCLA. I mean, I've had a few of these cases, but I find them somewhat difficult. Why did the parties go to Judge Conte in 89 and get a judicially approved settlement instead of just settling the case and just taking a voluntary dismissal? I don't know the answer to that, and that's just not clear from the record. Why would parties do that? So I'm not now asking specifically as to the 89 settlement, but why would they do that in a CERCLA case? I would think the usual reason that they would do that is because they anticipated future fights, and they wanted to retain the continuing jurisdiction of the Court as a resort to how to resolve those fights in the future. But that's the same reason why Wicklund or, I mean, Virginia Chemicals' argument that this could alternatively fall under the judgment portion of G.A. fails, because it's a voluntary dismissal, there is no appeal from that dismissal, and the district court retained jurisdiction. So it has to fall within one of the categories in F.3.B. And here, because F.G.3. Excuse me, G.3.B., and here, the only case before this Court, the only claim is the F.B.3 claim from the 2008 settlement. Is it customary for settling private settling parties in a CERCLA case to get a judicial approval of the settlement? Not necessarily. I guess if we hold that there's a three-year statute of limitations, it will become customary. But sometimes parties don't, and that's the other reason why we don't. Is it required or customary that there be judicial approval of a settlement with the United States? Yes. Is it required? It is required. How about a judicial or is it customary or required to have judicial approval of a settlement with a State? If it's under CERCLA, yes. It's required? I believe that CERCLA requires it. I saw the requirement for a settlement with the United States. I had trouble finding it for a settlement with a State. I believe there's only one district court that has addressed that question, and I believe that they found that it should be a requirement as well, precisely because you need to give other interested parties, other potentially responsible parties, the opportunity to object because of the contribution protection. This may be a little bit off to one side of what we're after. Okay. If there's no further questions, I'd like to reserve whatever time I may or may not have left. We've taken all of your time, but we'll make sure you get a chance to say what you need to say. Good morning, Your Honors. John Edgecombe, Edgecombe Law Group, for Defendant and Appellee CNA Holdings, which is the successor in interest to Virginia Chemical, the company that leased the small 1.3-acre parcel. You've stolen most of my thunder. It seems like you've already addressed a number of the points that we make in our brief. Sort of addressing the issues that you took up with Counsel for Osarko, she suggests that the bankruptcy did not relate to the response costs that were covered in the settlement agreement, that somehow it was separate and apart from that. But the fact of the matter is it was controlled by that 1989 settlement agreement. The $33 million that was paid was determined based on the 33 percent that Osarko was assigned to pay under the 1989 settlement agreement applied to an estimated $100 million cost to complete the remediation. For Phase I? Yes, assuming that they were Phase I costs. So we're not getting the 42 percent for Phase II? That's right. There's, you know, it hasn't been decided, you know, exactly which costs go into which bucket. But that's typical of a circle of litigation. I mean, these cases are brought and settled or judgments reached with percentages allocated, often long before a remedial plan is put into effect and completed. And, Judge Watford, you made the point that or perhaps it was you, Judge Fletcher. I'm not sure. But, you know, in this case, Osarko could have brought its contribution claim in 1983 when they were first sued by the landowner at the time. They chose not to. They litigated until 1989. At that time, there was a settlement. In the settlement, the three parties not only obtained judicial approval of the settlement, which in our view triggers the plain language of 113G3B, which talks simply about a judicially approved settlement without limitation to it having been with a State or Federal government. But they also took the further step, which in my experience is extremely unusual, of having that settlement entered as a consent judgment, which triggered 113G3A. Now, from my point of view, these parties knew what they were doing, and they did it to intentionally trigger the statute of limitations, the three-year statute for contribution actions. And you asked, Judge Fletcher, why would they do that? Well, from my perspective, the reason they did it is so that they wouldn't face contribution actions 20, 30 years later, which is exactly the situation we find ourselves in now. Well, I'm not sure that's right. Why would they do it? They were limiting themselves, right? Well, if you're Shore Terminals or not Shore Terminals, if you're Wickland or State Lands Commission, maybe you're satisfied with your percentage allocation, and you're not planning on bringing any more contribution actions. But ISARCO might, and ISARCO has. And if this action were to proceed further, we would be able to make contribution claims against them, and they'd be dragged right back into, you know, further, endless, circular contribution litigation. What they're accomplishing is saying, look, if you're going to go out and sue anybody else, like Virginia Chemicals slash CNA, do it now. We don't want to have this going on for another 20, 30 years. But that's exactly what we now have. ISARCO is yes, sir. You're saying that the management cut off their right to get money from a third party. I'm saying that's the intent behind having this file. I'm not saying they cut it off. They still have three more years to decide whether or not to do it. And if they decide not to, then they at least have the comfort that nobody else is going to do it and have us dragged back into this. They'll get some finality, you know, and that's one of the purposes of having statutory limitations, is to bring all the responsible parties to the bargaining and remediation table sooner rather than later. Can you just walk us back through, I'm not saying you didn't do a good job, but just walk us back through the analysis as to why the response costs that are put in play in the bankruptcy by DTSC, why are they covered by the 1989 settlement? Yes, Your Honor. The 1989 settlement agreement did two things, in effect. The three parties promised, and this was an enforceable promise by the district court, to clean up the site. They also, among themselves, agreed that whatever those response costs turn out to be, they're going to be allocated, depending on which bucket they're in, you know, either one-third each or the other allocation, where ASARCO gets 42 percent. Thereafter, it's just a matter of going out and doing the work. We have testimony from Donald Robbins, who is the remediation manager for ASARCO, that thereafter, that's what they did. They went out and they conducted investigations, they conducted remediation. Those costs were allocated one-third each because they were all deemed to be within phase one of the work. And included in phase one was remediation of the Virginia Chemicals acid-affected area. That was a known problem. Those costs were phase one, and so whatever it cost, either, you know, what was in the wrap or subsequent modifications, they were going to be allocated one-third each. The only thing that changed is ASARCO went into bankruptcy. Otherwise, they would have continued along that path. When ASARCO went into bankruptcy, ASARCO got to liquidate its one-third cost under the Wicklands Settlement Agreement, but to come up with a payment to discharge them from bankruptcy, they had to apply that against an estimated cost. They came up with $100 million, so they paid $33 million. Donald Robbins, again, the remediation manager for ASARCO, testified in deposition and also offered a proffer when the settlement was challenged by ASARCO's parent to say that, look, don't worry, ASARCO, we're not changing the terms of the Wicklands Settlement Agreement, we're basically enforcing it here. And, in fact, in the order approving the bankruptcy settlement agreement, the ASARCO parent got worked in there a term, a new term, that the Court enforced that said, if you think ASARCO is overpaying compared to what it's obligated to pay in the Wicklands Settlement Agreement, you can challenge that. So, in other words, the Wicklands Settlement Agreement remained vital. It controlled how the bankruptcy settlement was written. And, you know, ASARCO ended up paying their 33 percent, just like they had originally committed. So there was no new response costs that came up as a result of the bankruptcy. It's just the same remediation of the Virginia Chemicals site. Kennedy. But why what I could not figure out from your brief is why didn't you argue, I'm not quite in the weeds as much as you are, but I'm just looking at, I think it's paragraph E sub 3 of which document? Of the 1989 settlement agreement. I guess I would have thought this were this would constitute a subsequent modification. I'm just reading the language. It said, A subsequent modification will be deemed part of the remedial action plan if, A, ordered by a government agency. To me, that was the language that most naturally covered what happened in the bankruptcy proceeding. But you never argued that provision of the 1989 settlement. I'm just wondering why. That's why I started out asking the question I did. This wasn't voluntary. Wasn't it ordered by the DTSC? You heard your opponent say, no, it wasn't. So am I missing something? Well, the subsequent modification language really goes to modification of the remedy itself. You know, DTSC had didn't modify the remedy by making its claim in the bankruptcy court. DTSC was just saying, look, before you go away, we need to make sure that you live up to your obligations in that 1989 Wicklund settlement and that you continue to pay your fair share. And so what what the parties all agreed to in the settlement is, OK, we estimate that your 33 percent, 33 percent share to finish the remediation is going to be about $33 million because the remedy is $100 million. We, DTSC, will take that $33 million, put it in a special trust account, and we're going to act like ASARCO would have if the Wicklund settlement agreement had, you know, continued on with ASARCO actively participating. And as remedial costs are incurred, we're going to pay out ASARCO's 33 percent share out of this trust fund. I mean, that's how it's going to work. And as a result of the bankruptcy, ASARCO's liability under the 1989 settlement is completely destroyed. They liquidated it and capped it. But it's that that payment is fully derivative of the 1989 Wicklund settlement. So so when that Wicklund settlement triggered the three-year statute of limitations and it ran in 1992, any claims arising out of those same response costs, right, they're time-barred. And just the fact that you have a bankruptcy, you know, where they're liquidated and capped, those aren't new response costs, so they can't grow a new claim. Let me ask you this as a return to something that we were on before, and Judge Duffy and I, I think, might have had some version of the same question. What's the advantage to the settling parties in the Wicklund settlement in 1989 of getting a judicially approved settlement? I can see a disadvantage to the settling parties if the statute of limitations starts to run and that after three years, they are, by virtue of its being a judicially approved settlement, they are no longer able to seek contribution. So I can see a disadvantage to the settling parties to getting a judicial approval  What's the advantage to them of getting a judicially approved settlement? I'll take a second run at it. I think there's a couple. One is, again, there could be parties that feel like they've paid their fair share. They're not planning on making further contribution claims. And they want to make sure that the statute is running so that if other settling parties want to pursue contribution actions, which they may be drawn into, that they happen sooner rather than later. Wait. No, wait a minute. I'm missing this. I've got three settling parties. Yes. They enter into the judicially approved settlement. Judge Conte signs off on it. He sort of incorporates it. It's a fairly long document. I got that. Now, who are they protecting themselves against? Well, in this case, let's say with once you have the judicially approved settlement, that triggers three-year statute of limitations. Right. Let's just take a situation. Let's say you're State Lands Commission. You're paying 33 percent. Right. You think you're done. Right. You don't want to be engaged in any more surplus contribution litigation. Yeah. You want to trigger the three-year statute of limitations so that if a SARCO is thinking about going out and suing 20 new parties, that they're going to do it within three years. And if they don't, then you have your peace after three years. Because if a SARCO goes out and sues all these other parties, they can then sue me. State Lands Commission. That's the key. Sorry. That's the piece I was missing. Yes. For example, as I said, if, you know, the statute of limitations isn't applied here, you know, and we the litigation continues, we would sue the other parties. So they're not protecting themselves against each other directly because they've settled. That's right. But they're protecting each other from the consequence if one of them decides outside the three-year period to go after somebody else, and all of a sudden that somebody else or several somebody else comes back in and says, well, if I'm on the hook, so are you, I get it. Okay. That's right. So I don't know if there are any other questions. I think, you know, obviously, we believe that the language of 113G3B is straightforward. There's no reason to read into it that it has to be a settlement with State or Federal Government. There's, you know, Supreme Court and Ninth Circuit precedent that holds that if in another section language was used to limit a particular term and it's not carried over to the next term that you assume Congress knew what they were doing by not limiting settlements in that manner. The 1989 Wickland Settlement Agreement covered all the response costs that have or could ever be addressed in the future, and so the bankruptcy settlement simply liquidated those claims. Robertson, let me ask you, if I can, the same question I asked Ms. Larson, and that is to say, how customary is it for private settling parties in a circular case to get themselves judicial approval of the settlement? Well, in my experience, it's fairly common because it's the first step towards getting contribution protection where you have to go back to the court and get a determination that it was a good-faith settlement, and then you can argue that under either the UCFA, Uniform Comparative Fault Act, or UCADA, that you've paid your fair share and that, therefore, you're entitled to contribution protection. You know, private party settlements are different than government settlements where it's just automatic contribution protection, and, you know, the settling, the party that's getting the money, just there's a setoff to all the other PRPs out there for the amount paid. Right. With private party settlements, there's nothing in CERCLA that says, you know, what credit is given to all the other parties as a result of the payment. So you get judicial approval as a step towards a determination of good-faith settlement, which gives you contribution protection. Other than that, the, you know, another reason would simply be to trigger the three-year statute running so you don't face, you know, forever contribution actions. And, you know, here, this is the problem. We have, you know, ISARCO making claims 20, 30 years later. You know, it's contrary to the policy behind CERCLA to bring all the parties to the table sooner rather than later so that they can participate in the remediation and everything. I mean, here, CNA has not paid attention to this for the 20, 30 years that this has gone on. You know, and ISARCO had nine years from the time they were first sued until, you know, the three-year statute ran. And they knew full well about Virginia Chemicals. I mean, they were addressing it on site, and they didn't sue them. You know, they have no one to look to but themselves. Thank you, Your Honor. Roberts. Thank you. Now, Ms. Larson, we've taken you over time. This is an efficiently complicated case. Why don't we put three minutes on the clock? First, I'd like to correct the misapprehension that the 1989 judicial approval of the Wickland settlement somehow conferred contribution protection on the parties to that settlement. You only get contribution protection under CERCLA if you settle with the United States or a State. What you get in 1989 if you, among yourselves, pay some money towards the clean-up of a site in a subsequent contribution action by others or with others is the argument I already paid my fair share, now you pay. That's different from a shield of a contribution claim from someone else. The parties in the Wickland agreement were subject to enforcement actions by the State or EPA and contribution actions by other parties. They got no protection by entering that judgment with the district court. Well, I just heard they got some protection. They got some protection in the sense that after three years, parties to that settlement are not going to go out and bring somebody else in, who that then might trigger claims against them. Well, I would also disagree that the three-year statute of limitations actually necessarily applies in this factual scenario. Well, I understand you say that it doesn't apply, but on the assumption that the three-year statute applies to a private judicially approved settlement, that argument seems to me plausible. I don't know how often it comes up. I don't know whether they're protecting themselves against a phantom danger, but I heard the argument. Again, it's based on the premise that somehow CERCLA conveys the shield to parties who have not settled with the government, and that simply was not the case in 1989. So all they got was an argument that they'd already overpaid. No, I guess I understood the argument not as there's some kind of a legal shield, but that it just starts the clock running on your co-settling parties, so that if they're going to go out and sue some other party, which in turn might sue you, they've got three years to do it. And if they don't, then you know that you're safe. And if we were pursuing an F-1 claim in this case, that would be probably dispositive of the past costs paid under the Wicklund agreement. But that's not what ASARCO is the case that ASARCO is bringing here. It's bringing an F-3 case because it settled with the United States – well, actually with the States, sorry. So Section 113 rewards those who settle with the government with two things, a separate and distinct right of contribution that sets the clock running again for three years, and contribution protection against other parties who have not settled. So in this case, if we are allowed to proceed with our case against Virginia Chemicals, they don't get contribution protection. They can't say that we haven't paid $33 million. We have. They have to argue that we haven't overpaid. That's a different issue. Kennedy. You know, this is maybe not down in the weeds of the statutory construction, but as I just look at the narrative as to what happened here, before Wicklund even gets involved, we have remediation by Virginia Chemical because there's an earlier enforcement action brought by the state, and Virginia Chemical takes away six feet of topsoil, and then there's a discharge of that order after about a year. So I understand, actually, just as a practical matter, why when the Wicklund thing comes up, why nobody goes after Virginia Chemical, because they've already done some work. And all of a sudden, here you are, many, many years later, coming back after Virginia Chemical, that before the Wicklund stuff comes up, they've already done some remediation during the entire lawsuit brought by Wicklund in the settlement, nobody goes after Virginia Chemical, and now all of a sudden you're after Virginia Chemical. I don't get it. Just on the sense of what they should be required to pay in addition to what they've already done, now these many years later, I don't get it. First of all, Your Honor, I don't believe that the record is as clear as what you have just described. There was a letter to Virginia Chemicals telling them to do certain things. That letter was rescinded, but there's no evidence that that work was completed. And the other thing to be known to you is that there's a fair amount of evidence. That is to say, we get discovery of the acid contamination in 1976, the California Regional Water Quality Control Board issues a cleanup and abatement order, they rescind that order after a year after work has been done. True, but the factual part of this case that is tricky and the reason why the remedy is tricky is because the acidity of the groundwater, which was changed by the operation of Virginia Chemicals' acid reduction plant or whatever it was, mobilizes the metals in slag, which are otherwise bound up in the slag.  Therefore, Virginia Chemicals, both factually and legally, is a potentially responsible party for the entire site. Under CERCLA, it's strictly liability for the, it has strict liability for the entire facility, not just for its own geographical area. It has not participated in the cleanup of this site for over 30 years. And its argument now is that because ASARCO cooperated, entered into private settlements, entered into judicially approved settlements with the government, we're done. We, Virginia Chemicals, don't have to do anything else. That's not how CERCLA works. CERCLA rewards those who settle and those who do the work and pursue the cleanup to the very end. And ASARCO should be allowed to pursue its F-3B claim in the trial court, in the trial court, and to have the trial court determine whether or not, at this point in time, after other parties have been working on this site for over 30 years, whether or not Virginia Chemicals has paid its fair share. Thank you. Roberts. Thank both sides for their arguments. ASARCO v. Celanese Chemical Company, which doesn't seem to exist in this case, is now submitted for decision.
judges: Duffy, Fletcher, Watford